UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| The Andover Companies Employee Savings and Profit Sharing Plan on behalf of itself, and James Pehoushek-Stangeland, and all others similarly situated, | ) ) ) ) | No. |
| Plaintiffs, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| vs. | ) | |
| | ) | |
| State Street Bank and Trust Company, and State Street Global Markets, LLC, | ) ) | |
| Defendants. | | |

**PLAINTIFFS' CLASS ACTION COMPLAINT**

**Table of Contents**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   JURISDICTION AND VENUE ............................................................................... 4

III.  PARTIES ................................................................................................................ 5

      A.    Plaintiff Alan Kober ................................................................................. 5

      B.    Plaintiff James Pehoushek-Stangeland ..................................................... 6

      C.    Defendants ................................................................................................ 7

IV.   CLASS ACTION ALLEGATIONS ....................................................................... 8

V.    SUBSTANTIVE ALLEGATIONS ...................................................................... 11

      A.    The Nature of FX Trading Generally...................................................... 11

            1.    The Increasing Necessity of FX Trading in a Global
                  Investment Portfolio...................................................................... 11

            2.    How FX Trading Works ................................................................ 12

      B.    Negotiated vs. Non-Negotiated FX Trades:  Trades for Custodial
            Clients ..................................................................................................... 13

            1.    Custodial Clients Relied Upon State Street's Expertise and
                  Loyalty ......................................................................................... 14

            2.    State Street's Custodial Contracts and Investment Manager
                  Guidelines Were Predicated on No-Cost FX Trading ................... 15

            3.    State Street's Deceptive Scheme Overcharged Custodial
                  Clients for Standing-Instruction FX Trades ................................. 16

            4.    For its Custodial Clients, State Street's Deceptive Acts and
                  Practices Could Not Reasonably Be Detected. .............................. 20

      C.    Events After October 2009 Begin to Shed Light on State Street's
            Deceptive FX Trading Practices ............................................................. 20

      D.    FX Trading and State Street's Commingled ERISA Fund Clients.................... 22

            1.    The Plaintiffs' Plans...................................................................... 22

            2.    Defendants' Fiduciary Status........................................................ 24

      E.    State Street's FX trades were prohibited transactions under ERISA
            and corresponding federal regulations. ................................................. 28

VI.   PRAYER FOR RELIEF ....................................................................................... 35

Plaintiff Alan Kober, as Trustee and fiduciary of The Andover Companies Employees Savings and Profit Sharing Plan (the "Andover Plan"), on behalf of the Andover Plan, and Plaintiff James Pehoushek-Stangeland as a participant and beneficiary of The Boeing Company Voluntary Investment Plan ("Boeing Plan") and all other ERISA Plans (together, the "Plans") that suffered losses as a result of State Street's foreign currency exchange trading practices as alleged herein, by and through its undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

## I.   PRELIMINARY STATEMENT

1.    This complaint arises from Defendants State Street Bank and Trust Company ("State Street Bank"), and State Street Global Markets, LLC's ("SSGM") (collectively, "State Street" or "Defendants") self-dealing and imprudent management of the Plans' commingled funds managed by State Street in violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). This is a civil enforcement action brought pursuant to 29 U.S.C. §§ 1001, *et seq.*, and under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), to recover losses and obtain equitable relief on behalf of the Plans and all other similarly situated Plans. State Street Bank and SSGM were required to act prudently and solely in the interest of the Plans' participants and beneficiaries in their capacity as ERISA fiduciaries. In particular, State Street breached its fiduciary duties under ERISA by purchasing and selling foreign securities through the use of foreign currency exchange transactions at rates favorable to Defendants. These transactions were prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

2.    Plaintiffs also allege that Defendants failed to act solely in the interest of the participants and beneficiaries of the Plans and breached their fiduciary duties of prudence and loyalty with respect to the Plans. Specifically, Plaintiffs allege that Defendants, as fiduciaries of the Plans, violated their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, by causing the

Plans to engage in transactions that were not for the exclusive benefit of the Plans or their participants and beneficiaries.

3.     State Street was the trustee for the Defined Contribution Plans Master Trust Agreement between Merrimack Mutual Fire Insurance Company and State Street Bank and Trust Company dated September 1, 2002, and investment manager for the Andover Plan's assets invested in State Street's proprietary commingled funds ("the Funds").

4.     State Street was the trustee for The Boeing Company Employee Savings Plans Master Trust ("Boeing Master Trust") and managed certain funds in the Boeing Master Trust. As of December 31, 2011, the assets of The Boeing Company Voluntary Investment Plan (the "Boeing Plan") comprised 100 percent of the Boeing Master Trust. The Boeing Master Trust holds the Boeing Plan's assets that are invested in State Street's Funds.

5.     As investment manager for the commingled Funds, State Street Bank contracted on behalf of the Funds for which it served as investment manager for custodial services from its affiliated State Street entities such as SSGM. State Street additionally served as custodial bank for certain of the Plans in the Class including the Boeing Plan, and this also served as a custodian bank for all the foreign currency transactions at issue for certain of the ERISA-covered plans.

6.     A custodian bank is an institution that holds securities on behalf of investors. The role of a custodial bank is to safeguard and record movement of assets, including holding assets and securities in safekeeping with appropriate valuations, arranging settlement of all purchases and sales and deliveries in and out of the account, administering corporate actions for securities, and maintaining and managing all cash transactions, including foreign currency transactions. Custodians are typically used by investors who do not wish to leave securities on deposit with their broker-dealers or investment managers. By separating these duties, the use of custodians— at least in theory—reduces the risk of fraud or other misconduct. An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

7.      As of 2011, State Street held approximately $22.8 trillion in assets under custody and administration, making it one of the largest providers of custodial services in the world.[1] State Street charged the Plans, in combination with its other clients hundreds of millions of dollars a year in fees for custodial services.

8.      As part of its array of ancillary custodial services. State Street executed foreign currency exchange ("FX") transactions on behalf of its clients in order to facilitate clients' purchases or sales of foreign securities or the repatriation of foreign currency into U.S. dollars. During the past decade, pension funds and other institutional investors have increasingly looked to overseas companies and securities markets in order to diversify their holdings and maximize investment returns. Because foreign investments are bought and sold in the foreign currencies of the nations in which they are issued, U.S.-based investors necessarily must purchase and sell those foreign currencies in order to complete the transactions.

9.      Mr. Kober and Mr. Pehoushek-Stangeland ("the Plaintiffs") and the members of the Class reposed a high degree of trust in State Street. As trustee and investment manager for their Funds, and a fiduciary, State Street Bank authorized its affiliated entities, such as SSGM, to execute FX transactions under conditions in which the State Street Defendants controlled all aspects of FX trades, including the cost borne by Plaintiffs. Plaintiffs and the Class members depended upon State Street not only to execute FX trades honestly, but also to carry them out on terms no less favorable than the terms generally available in comparable arm's length FX transactions between unaffiliated and unrelated parties.

10.     Despite these legal obligations, State Street has undertaken an unfair and deceptive practice since at least 1998, whereby FX transactions were conducted behind a veil of secrecy so as to maximize exorbitant and undisclosed profits to State Street at the direct expense of the Plaintiffs' Plans and other Class Members. Upon information and belief, State Street charged its custodial clients and the Funds inflated FX rates when buying foreign currency on

---

[1] *See* http://www.statestreetglobalmarkets.com/ (follow link to "Foreign Exchange Global Strategy") (last visited September 12, 2012).

their behalf, and deflated FX rates when selling foreign currency for them, and in both cases pocketed the difference. In this regard, State Street charged the Plans and the Class incorrect and often fictitious FX rates unrelated to the market-based rates State Street was actually paying or received when SSGM executed the FX trades.

11.     The Plans and other Class members could not reasonably have detected State Street's deception. For the Funds and their fiduciaries and participants, the transaction was essentially conducted and reported between two affiliated State Street entities (State Street Bank and SSGM) and not reported on the fund fact sheets or otherwise reported to Plan sponsors, such as Mr. Kober, or to Plan beneficiaries, such as Mr. Pehoushek-Stangeland. For its clients, nothing in the FX rates State Street actually reported indicated that the rates being charged included hidden and unauthorized mark-ups (or mark-downs).

12.     State Street's unfair and deceptive FX trading practices, perpetrated on the Plans and the Class, generated hundreds of millions of dollars in profits annually for State Street. This money was taken directly from the pockets of the Plans and Class members' retirement accounts.

13.     Mr. Kober and Mr. Pehoushek-Stangeland bring this action as a class action on behalf of all similarly affected ERISA clients of State Street during the Class Period defined below, in order to recover the proceeds State Street reaped from Class members through its unfair and deceptive FX trading practices.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

15.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

### III.   PARTIES

**A.   Plaintiff Alan Kober**

16.     Plaintiff Alan Kober is an Individual Trustee of The Andover Companies Employees' Savings and Profit Sharing Plan (the "Andover Plan") pursuant to § 10.03 of The Andover Companies Employees' Savings and Profit Sharing Plan and Trust Agreement, Amended and Restated Effective as of January 1, 1989. In this capacity, Mr. Kober is a Plan fiduciary with standing to bring claims for breach of fiduciary duty on behalf of the Plan pursuant to ERISA §§ 409 and § 502(a)(2).

17.     Plaintiff Merrimack Mutual Fire Insurance Company ("Merrimack Mutual") is the designated Plan Administrator for the Andover Plan. The Andover Plan is an ERISA-qualified defined contribution plan established for the benefit of the employees of Merrimack Mutual and its sister companies, Cambridge Mutual Fire Insurance Company, and Bay State Insurance Company, which, together with Merrimack Mutual, comprise the Andover Companies ("Andover Companies"). Andover Companies is a New England mutual insurance institution which offers insurance programs and is managed from its headquarters in Andover, Massachusetts.

18.     As trustee for the Andover Plan, pursuant to Section 4.1 of the Master Trust Agreement, State Street Bank was required to exercise power and authority over the investment accounts for which it has express investment management discretion, or upon the direction of the Investment Manager. The investment power of the trustee includes the power to "purchase and sell foreign exchange and contracts for foreign exchange, including transactions entered into with State Street Bank and Trust Company, its agents or its subcustodians." The Master Trust Agreement further provides that nothing in the plans requires any investment manager to make any investments which constitute a prohibited transaction.

19.     Pursuant to the Investment Manager Agreement between State Street Bank and Merrimack Mutual entered on April 1, 2001, State Street Bank was appointed investment

manager pursuant to Section 3(38) of ERISA with respect to all cash, securities, or other property designated by client.

20.     During the relevant time period, the Andover Plan offered participants investments in several State Street Bank-sponsored commingled Funds as part of the Plan's core investments. International Equity Funds were one category of core investments for the Andover Plan, which also included Stable Value Funds, Fixed Income Funds, Balanced Funds and Domestic Equity Funds. During the class period, the Andover Plan included the following proprietary commingled International Equity Funds to participants for investment: International Growth Opportunities Securities Lending Class A Fund, and SSgA Daily International Alpha Select. State Street Bank served as the Trustee for Andover Plan, and served as the Investment Manager for Andover Companies Plan's investment in the International Equity Funds. The Andover Companies Plan suffered losses as a result of State Street's unfair and deceptive FX trading practices on behalf of the International Equity Funds.

**B.     Plaintiff James Pehoushek-Stangeland**

21.     Plaintiff James Pehoushek-Stangeland is a resident of Seattle, Washington. He works for the Boeing Company and is a participant in the Boeing Plan, an ERISA-qualified retirement plan. Accordingly, Plaintiff Pehoushek-Stangeland has standing to bring suit on behalf of the Boeing Plan for losses to the Plan due to breaches of fiduciary duty pursuant to ERISA §§ 409, and § 502(a)(2).

22.     During the relevant time period, the Boeing Plan offered participants investments in several State Street Bank-sponsored commingled Funds as part of the Plan's core investments. The International Index Fund was one category of core investments for the Boeing Plan, which also included Lifecycle Funds, Stable Value Funds, Bond Funds, Balanced Funds, and Domestic Equity Funds. During the Class Period, the Boeing Plan included the following proprietary State Street Funds: the State Street Bank Global All Cap Equity ex-US Index Securities Lending Series Fund Class I ("State Street Bank Global Lending Fund"); and the State Street Bank Global All Cap Equity ex-US Index Non-Lending Series Fund Class A ("State Street Bank Global Non-

Lending Fund"), for participants to invest in. As of December 31, 2010, the Boeing Plan held approximately $1.98 billion in Plan assets in the State Street Bank Global Lending Fund. As of December 31, 2011, the Boeing Plan held approximately $1.863 billion in the State Street Bank Global Non-Lending Fund. As of December 31, 2010, and December 31, 2011, these investments constituted approximately 6% of the Boeing Master, respectively.

23.     State Street served as the Trustee for the Boeing Master Trust, which holds the assets of the Boeing Plan, and as the investment manager for certain funds in the Boeing Master Trust. The Boeing Plan suffered losses as a result of State Street's unfair and deceptive FX trading practices on behalf of the International Index Fund (together with Plaintiff Kober's international funds, "The International Equity Funds").

24.     The Plaintiffs have standing to bring this action, and pursuant to Federal Rules of Civil Procedure 23, to bring a representative action on behalf of the Andover Plan and the Boeing Plan, and the class of Plans which incurred losses as a result of State Street's breach of its fiduciary duties as the Investment Manager and custodian of FX trades for the Plans' investments in the International Equity Fund(s) and/or the International Index Fund(s).

**C.     Defendants**

25.     Defendant State Street Bank is the trustee of the Plans. All money that employees contribute to the Plans is held in a trust fund, and State Street Bank is responsible for safekeeping of the funds. State Street Bank is also the investment manager for the Andover Plan, and provides investment management and custodial services to the Boeing Plan.

26.     Defendant State Street Bank is a registered financial holding company with its principal place of business in Boston, Massachusetts. During the Class Period, State Street Bank directly, or indirectly through one or more subsidiaries provided custodial banking and FX trading services to ERISA-covered benefit plans and for the Funds offered by ERISA-covered Plans, such as the Plans. One of the services provided by State Street Bank to its custodial clients was the execution of FX transactions, which allowed clients to purchase and sell foreign securities or to engage in foreign currency trades for other purposes.

7

27.     Defendant SSGM, formerly known as State Street Capital Markets, is similarly headquartered in Boston. SSGM is the "investment research and trading arm of State Street Corporation" and it provides trading in foreign exchange for its clients. SSGM provides specialized investment research and trading in foreign exchange, equities, fixed income, and derivatives to ERISA-covered benefit plans. During the Class Period, SSGM provided custodial banking and FX services to the Plans and members of the Class.

## IV.   CLASS ACTION ALLEGATIONS

28.     **Class Definition.** Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Andover Plan and the Boeing Plan, and the following class of persons similarly situated (the "Class"):

> All qualified ERISA plans, and the participants, beneficiaries, and named fiduciaries of those plans, that invested directly or indirectly in the State Street Bank commingled Funds, which includes the "International Equity Funds" identified in this complaint; or for which State Street Bank provided investment management or custodial services, that utilized SSGM's FX trading services, and suffered damages as a result of the deceptive acts and practices and other misconduct alleged herein, at any time between January 2, 1998 and the present. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officer, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such entity.

29.     **Numerosity.** The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of ERISA-covered benefit plans throughout the country offered the International Equity Funds and/or utilized State Street's trust or custodial services and that these plans collectively have tens of thousands of participants and beneficiaries.

30.     **Commonality.** The claims of Plaintiffs and the members of the Class have a common origin and share a common basis. The claims of all Class members originate from the same misconduct, breaches of duties, and violations of ERISA, perpetrated by Defendants.

Proceeding as a class is particularly appropriate here because the International Equity Funds are proprietary commingled funds that are held in collective trusts managed by State Street Bank, in which assets of every plan that invests in the International Equity Funds are pooled, and therefore, State Street's deceptive acts and practices and misconduct regarding its FX trading practices affected all plans that invested in the International Equity Funds in the same manner. Similarly, for the custodial clients, State Street's deceptive acts and practices concerning FX trading were perpetrated on a class-wide basis.

31.     There are questions of law and fact common to the Class, including:

(a) Whether Defendants breached their fiduciary duties under ERISA by overcharging the Plans or Funds at issue in which the Plans invested, for their FX trading practices;

(b) Whether Defendants engaged in unfair and deceptive acts and practices in connection with FX transactions, so as to maximize their own profits at the expense of the Plans;

(c) Whether Defendants' self-interested FX transactions constituted prohibited transactions under ERISA;

(d) Whether Defendants pocketed the difference between the actual, market-based FX rates and the false FX rates reported and charged to the Plans and the International Equity Funds;

(e) Whether Defendant SSGM failed to provide complete and accurate information to plan sponsors, fiduciaries, and participants when they entered into the FX trading transactions on behalf of the Plans and the International Equity Funds;

(f) Whether Defendants' acts proximately caused losses to the Plans, and if so, the appropriate relief to which Plaintiffs, on behalf of the Plans and the Class are entitled;

32.     **Typicality.** Plaintiffs are willing and prepared to serve the Court and the proposed Class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other members of the class.

33.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs are members of the Class described herein.

34.     The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

35.     A class action is superior to other available methods for the adjudication of this controversy. Individual litigation by all Class members would increase the delay and expense to the parties and the Court given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be more fair, efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

36.     **Adequacy.** The interests of the Plaintiffs are co-extensive with, and not antagonistic to, those of the absent Class members. Plaintiffs will undertake to represent and protect the interests of absent Class members. The undersigned counsel for Plaintiffs and the Class are experienced in class action, complex, and ERISA litigation, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and absent Class members.

37.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Compared to individual actions by each Class member, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

38.     **Rule 23(b)(1)(A) & (B) Requirements.** Class action status in this ERISA action is warranted under Federal Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the

interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

39. **Rule 23(b)(2) Requirements.** Certification under 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

40. **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## V.   SUBSTANTIVE ALLEGATIONS

**A.   The Nature of FX Trading Generally**

**1.   The Increasing Necessity of FX Trading in a Global Investment Portfolio**

41. During the past decade, in order to meet their investment and funding objectives, U.S.-based institutional investors have found it increasingly necessary to enter the overseas securities markets and expand the global scope of their investment portfolios. The International Equity Funds offered by State Street to institutional investors, for example, generally invest the bulk of their assets in securities or stocks of companies whose headquarters and/or primary business is outside of the United States.

42. Institutional investors that buy and sell foreign securities, such as State Street on behalf of the Plans and the other Class members, must engage in FX trading because the purchases, sales, dividends, and interest payments are all transacted in the currency of the nation in which the relevant securities exchange sits.

43. If, for example, a U.S. investor wishes to buy shares of stock in a German company that trades on a German securities exchange, the investor must sell U.S. dollars and purchase euros in order buy those shares. Further, any cash dividends paid on that German stock will be denominated in euros. To "repatriate" those dividends, the investor must sell the euros

received and purchase dollars. Accordingly, FX transactions are the means for converting U.S. dollars into foreign currency and vice versa.

**2.      How FX Trading Works**

44.      FX trading takes place around the world on a nearly 24-hour cycle, five-and-a half days a week. The official FX trading week begins at 7:00 a.m. New Zealand time on Monday, with each subsequent trading day ending at 5:00 p.m. New York City time.

45.      For each currency bought and sold during the course of the FX trading day, there will necessarily be a high trade and a low trade, with all other trades falling somewhere in between. This information is determined through trade data monitored and tracked by proprietary services such as, but not limited to, Electronic Brokerage System ("EBS") and Reuters.

46.      The difference between the low trade and the high trade is called the "range of the day." More precisely, the "spot range of the day" refers to FX rates as of a specific and prompt settlement date, usually two business days after the trade date. To more accurately measure the trade cost for FX transactions that settle prior to or later than the date for spot trades, participants in the FX market also look to the "forward-adjusted range of the day." Because FX trades do not always settle two days after the trade, the forward-adjusted range of the day is a more conservative and accurate measurement such that it takes into account the interest rate differential that exists at the time of trade between the trade date and settlement date for the underlying currencies.

47.      By way of example, assume 100 FX trades in euros-for-dollars (EUR-USD) during the course of one trading day. If the lowest rate trade occurred at $1.25 to buy €1.00, and the highest rate trade occurred at $1.35 to buy €1.00, the range of the day would be $1.25-$1.35.

48.      Another useful measure is the daily "mid-rate," which is simply the sum of the forward-adjusted daily high and forward-adjusted daily low, divided by two. This rate reflects the "average" FX rate in a given currency on a given day.

49.      The daily mid-rate is significant because of the absence of publicly accessible data showing the precise time of day at which FX trades occur (as exists with stock trading, for

example) and because State Street did not disclose such information to its clients. By looking at the mid-rate over a significant period of time, however, one can reasonably estimate the average FX trade cost on any given day. Over the course of a month or years, it is reasonable to expect FX trades to regress to the mid-rate. On any given day, some trades might settle above or below the daily mid-rate, but over increasingly lengthy periods of time, a significant number of FX trades can be expected to occur at or extremely close to the mid-rate.

**B.      Negotiated vs. Non-Negotiated FX Trades:  Trades for Custodial Clients**

50.      As set forth in the *Arkansas State Teacher Retirement System v. State Street Corp.*, No. 11-cv-10230 (MLW) (Apr. 15, 2011) complaint, State Street gave its custodial clients a choice with respect to the manner in which FX trades would be conducted. In a "negotiated," or "active," FX trade, a custodial client or its outside investment manager would personally communicate the trade information to a State Street FX trader. The State Street FX trader would then quote a rate, which would be accepted or rejected. If accepted, State Street would execute the FX trade at the agreed-upon price, which could include a modest mark-up.

51.      A "non-negotiated" or "standing-instruction" FX trade is essentially the opposite of a negotiated trade. There is no arm's-length negotiation of the price between the parties to the transaction. With non-negotiated or standing-instruction trades, custodial clients and their outside investment managers do not negotiate rates with State Street, and State Street does not quote rates. Instead, as the name "standing-instruction" suggests, custodial clients simply report the desired currency transaction to State Street, and trust and rely upon State Street, using "best execution" practices, to execute the trade on the client's behalf. According to its Investment Manager Guides, State Street referred to standing-instruction FX transactions as "Indirect Deals" between 2000 and May 2008, and "Institutional Investors FX Trading" between May 2008 and November 2009. Since November 2009, State Street has referred to such trading as "Custody FX."

52.      State Street's custodial clients reasonably expected that standing-instruction FX trades would have no mark-ups or fees. This was in view of, among other things, (a) the hefty

annual fees custodial clients paid State Street to serve as custodian over their assets, (b) the
Custodian Contracts and associated fee schedules that gave no indication that standing-
instruction FX trading would incur extra fees or mark ups, and did not authorize any such fees or
mark-ups, and (c) State Street's Investment Manager Guides that assured custodial clients and
outside investment managers that the price of FX trades was *"based on the market rates at the
time the trade is executed."*

53.     Institutional investors typically requested that State Street and other custodians
handle the smaller FX transactions, mostly the repatriation of dividend and interest payments,
through standing instructions because the amount of each trade rarely justified the time and effort
required for a negotiated trade.

    **1.     Custodial Clients Relied Upon State Street's Expertise and Loyalty**

54.     Since at least 1998, State Street executed the majority of custodial client FX
transactions for its accounts, including purchases and sales of U.S. and foreign currency as well
as repatriations of dividends and interest payments into U.S. dollars.

55.     Custodial clients reposed a high degree of trust in State Street to execute standing-
instruction FX transactions. In conducting these transactions, State Street occupied a superior
position to its custodial clients due to its control over all aspects of the FX trade, including the
timing of the trades, and most importantly, the price at which the trades were executed.

56.     Custodial clients depended upon State Street not only to execute the FX trades,
but also to accurately and honestly report the FX rate and to carry out the trades in accordance
with their custodial contracts, associated fee schedules, and guidelines as set forth in the
Investment Manager Guides.

57.     Additionally, separate and apart from the custodial contracts and Investment
Manager Guides, State Street's custodial clients had a reasonable expectation that the FX rates
that State Street charged (or credited) on standing-instruction FX trades would accurately reflect
the true rates of those FX trades. There is no reason a custodial client would expect its custodian
bank—to which it was paying substantial annual fees for custodial services—to charge (or

credit) it in connection with standing-instruction FX trades at any rate other than the actual rate for the FX trade.

       **2.**      **State Street's Custodial Contracts and Investment Manager Guidelines Were Predicated on No-Cost FX Trading**

58.      State Street's form custodial contracts provided that State Street "shall be entitled to compensation for its services and expenses as Custodian" pursuant to "a written Fee Schedule between the parties."

59.      Custodial clients and State Street agreed to and executed a series of Fee Schedules covering the time period from 1998 to the present.

60.      The Fee Schedules either provided estimated annual fees or annual flat fees for State Street's services as a custodian.

61.      The Fee Schedules also set forth certain categories of ancillary services for which State Street was permitted to charge additional fees, including Wire Fees, Reporting Fees, Delivery Fees and Subcustody Fees.

62.      None of these particular ancillary service categories relate in any way to FX trading. The Custodian Contracts did not state that those ancillary fees relate to FX trading or that State Street would impose any fees in connection with FX trading.

63.      For one non-ERISA client, the Arkansas Teacher Retirement System ("ARTRS"), for more than a decade, its custodial contracts with State Street (a) expressly provided that standing-instruction FX trades would be executed free of charge; or (b) did not list FX transactions among the services for which it was permitted to charge an additional fee or any other cost above the annual flat fee.

64.      Upon information and belief, substantially similar terms were employed in the Custodial Contracts for other members of the ERISA Class during the Class Period.

65.      Additionally, during the Class Period, State Street provided Investment Manager Guides to custodial clients and outside investment managers that contained comprehensive information about State Street's custody practices and services, including procedural

requirements, costs, and features. The many services described therein included "State Street Foreign Exchange Transactions."

66.     During the Class Period, State Street issued no fewer than 15 distinct Investment Manager Guides, including those dated July 9, 2003; August 9, 2005; September 26, 2006; October 17, 2006; November 20, 2006; December 15, 2006; January 25, 2007; October 30, 2007; November 21, 2007; December 19, 2007; January 28, 2008; May 1, 2008; October 31, 2008; December 30, 2008; and January 23, 2009, to custodial clients and outside investment managers.

67.     State Street represented in each of these Investment Manager Guides that "State Street Foreign Exchange Transactions . . . are *priced based on the market rates at the time the trade is executed.*" (Emphasis added.)

### 3.     State Street's Deceptive Scheme Overcharged Custodial Clients for Standing-Instruction FX Trades

68.     State Street's FX practices diverged from what the Custodial Contracts authorized and what the Investment Manager Guides represented. Despite assurances that FX transactions would be based on market rates, State Street reported and charged its custodial clients FX rates on standing-instruction trades far above what State Street actually paid for foreign currency (or far below what State Street actually received for sales of foreign currency)— oftentimes, at rates that actually fell *outside of the range of the day.*

69.     As such, unbeknownst to its custodial clients, State Street reported FX rates on standing-instruction trades to its clients that did not reflect the actual cost or proceeds of the FX transaction to State Street, and instead included a hidden and unauthorized mark-up. Put simply, State Street invented the FX rates it reported and charged (or credited) to its custodial clients. State Street paid or received one rate for FX, reported to its custodial clients another rate that was either higher (in the case of a purchase) or a lower (in the case of a sale), and pocketed the difference.

16

70.     When custodial clients or their agents requested that State Street execute an FX transaction, the request was routed electronically via State Street's Market Order Management System (MOMS) to a group of "risk traders" working at State Street's FX trading desk who then executed the FX trades by entering trade information that did not reflect the actual rate State Street paid or received.

71.     To illustrate the deception, assume again the example set forth above—100 euro-for-dollar trades on a given day that ranged from $1.25 to $1.35 (the "range of the day") to purchase €1.00, with a day's mid-rate of $1.30. On any, and all, standing-instruction euro-for-dollar trades on behalf of its custodian clients, State Street would have paid a rate between $1.25 and $1.35 for those euros, but reported to its clients that it paid more. State Street then would have charged its clients the false higher amount and kept the difference.

72.     This conclusion is supported by the analysis from non-ERISA custodial client ARTRS of ten years of FX transactions executed by State Street on behalf of and reported to ARTRS. Between January 3, 2000 and December 31, 2010, ARTRS had a total 10,784 FX transactions with reliable data. Among these 10,784 transactions, 4,216, or 39%, were non-negotiated, standing-instruction trades. These 4,216 FX trades had an aggregate trading volume exceeding $1.2 billion.

73.     In conducting the analysis, ARTRS found that its FX trades were logged and compared to other FX trades logged and tracked in a comprehensive database of more than 2 million buy-side currency trades. By comparing ARTRS's trades in certain currencies with the same currency pair trades in the database, one can estimate the trading cost of ARTRS's standing-instruction FX trades by State Street in relation to trades made worldwide. For purposes of this analysis, the trading cost is the difference between the day's mid-rate and the rate that State Street charged (or credited) to ARTRS for standing-instruction FX trades.

74.     State Street did not report to ARTRS (or any other ERISA-covered custodial client) the actual time of execution of any FX trade. Therefore, comparing the day's mid-rate to the standing instruction FX rates State Street charged (or credited) to ARTRS was the best

method of determining whether State Street charged (or credited) ARTRS a rate based on the actual market rate at the time of execution, as State Street represented it would do in its Investment Manager Guides.

75.    The analysis by ARTRS made clear that State Street derived its false FX rates by adding (on purchases) or subtracting (on sales) "basis points" or "pips" from the actual FX rate. A basis point, or pip, is a unit equal to 1/100th of a percentage point. For example, the smallest move the euro/dollar currency pair generally makes is 1/100th of a penny, or one basis point.

76.    For the period of January 3, 2000 through December 31, 2010, the FX rates that State Street reported and charged (or credited) to ARTRS on its 4,216 non-negotiated FX trades were, on average, *17.8 basis points* above or below the day's mid-rate. In other words, the FX rates that State Street reported and charged (or credited) to ARTRS for standing-instruction FX trades, on average and during this 10-year period, created a trading cost 17.8 basis points higher than the average FX rate (the day's mid-rate).

77.    By way of example, assume that the rate State Street actually paid to purchase €1.00 on a given day was $1.31551. If State Street charged ARTRS 17.8 basis points more than it paid, the rate would be $1.31729 ($1.31729 - $1.31551 = 0.00178). For a purchase of €10 million, the undisclosed profit to State Street on that single trade—and the concomitant unknown loss by ARTRS—would be $17,800. Accordingly, the difference in total trading costs between the actual and false rates can be very large.

78.    Tellingly, for the same 10-year period, the FX rates that State Street reported and charged (or credited) to ARTRS on its more than 6,500 *negotiated* FX trades added, on average, only *3.6 basis points* in trading costs as compared to the day's mid-rate. As such, while the FX trades executed by State Street pursuant to so-called "best execution" practices incurred trading costs of 17.8 basis points on average, the FX trades actively negotiated between State Street and ARTRS or its outside investment managers incurred trading costs of only 3.6 basis points on average.

79.     The false or fictitious nature of the FX rates State Street reported and charged (or credited) to ARTRS was further demonstrated when reviewing ARTRS's standing-instruction FX trades in the context of the forward-adjusted range of the day. Among ARTRS's 4,216 standing instruction FX trades, *2,217, or 53%, fell entirely outside the forward-adjusted range of the day.* These 2,217 FX trades, with a total volume exceeding $200 million, added trading costs on average of *64.4 basis points* over the day's mid-rate—an enormous hidden and unauthorized mark-up. For example, on a purchase of €10 million, an undisclosed fee of 64.4 basis points would result in a $64,400 profit to State Street on that single transaction alone.

80.     Rates consistently above (or below) the daily mid-rate alone demonstrate that State Street was not fulfilling its duties as a custodian by charging a hidden mark-up, and they demonstrate a violation of the terms of the custodial Contracts and the representations in the Investment Manager Guides. But when more than half of all standing-instruction FX trades for a particular custodial client fall *outside* the forward-adjusted range of the day, it becomes clear that those reported FX rates were not actual, market-based FX rates, but were instead fictitious and designed solely to gouge the custodial client and, in turn, its beneficiaries.

81.     There is no rational, honest basis for a professional FX market participant like State Street, or indeed any FX market participant, to charge an FX rate outside the forward adjusted range of the day without disclosing it. The day's range defines the range at which primary dealing banks and custodian banks transacted in FX during that trading day. The fictitious nature of rates assigned outside the forward-adjusted range of the day illustrates, perhaps most starkly, the unfair and deceptive nature of State Street's standing-instruction FX trading practices. In short, these practices were designed to enrich State Street while deceiving and unfairly depriving institutional clients such as ARTRS and State Street's other custodial clients of much-needed funds.

**4.     For its Custodial Clients, State Street's Deceptive Acts and Practices Could Not Reasonably Be Detected.**

82.     No custodial client could have reasonably discovered State Street's deceptive acts and practices concerning FX trading during the Class Period. State Street executed hundreds if not thousands of FX trades on behalf of its custodial clients every month. The periodic reports State Street sent to clients showed only the rate that State Street charged for its FX trades. The reports did not include the range of the day, the daily midrate, or any indication of the time of the day that the trade was executed (known as "timestamps"). Accordingly, there was no way for custodial clients to reasonably determine, or even suspect, that State Street was secretly charging more than it actually paid for FX or was paying clients less than it actually received for FX.

83.     It was reasonable for custodial clients to presume that the prices reflected in the reports State Street provided to them were an accurate representation of the true cost of the FX trades. Custodial contracts provided that monthly reports of monies received or paid on behalf of the client would be given to the client. Accordingly, State Street had an affirmative obligation to report accurately the amount of money it was paying or receiving for FX.

84.     Furthermore, based on the Investment Manager Guides' assurance that FX rates would be "priced based on the market rates at the time the trade is executed," no custodial client had any reason to suspect that they were being charged (or credited) anything other the rate that State Street itself had paid or received on those standing-instruction FX transactions.

85.     Moreover, as alleged above, State Street occupied a position of trust and confidence with respect to its custodial clients. Those clients would not, and did not, suspect that the custodian in which that trust resided, would profit to a gross and undisclosed degree on the services for which they paid a handsome annual fee. Indeed, those custodial clients would, and did, presume that the custodian bank would act in and not against their best interests.

**C.     Events After October 2009 Begin to Shed Light on State Street's Deceptive FX Trading Practices**

86.     On October 20, 2009, the Attorney General of California filed a Complaint in Intervention for violation of the California False Claims Act, Cal. Gov. Code § 12651, charging

State Street with misappropriating more than $56 million from the accounts of California's two largest pension plans—CalPERS and CalSTRS—over a multi-year period in connection with the same unfair and deceptive FX practices alleged herein. *People of the State of Cal. ex rel. Brown v. State Street Corp.*, No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento County Oct. 20, 2009).

87.     The California Attorney General alleged that State Street reported inflated FX rates when buying foreign securities for CalPERS and CalSTRS, reported deflated FX rates when selling foreign securities for them, and pocketed the difference between the reported and actual rates. The Attorney General further alleged that State Street hid its wrongful conduct by entering incorrect FX exchange rates into State Street's electronic FX trading systems and providing false records to CalPERS and CalSTRS.

88.     The California Attorney General's allegations of undisclosed "mark-ups" were based in part on the sworn testimony of a former State Street Bank employee who worked on the same trading floor as the State Street Bank and SSGM foreign exchange traders and who overheard how State Street Bank or SSGM foreign exchange traders were marking up FX trade prices. This trader, in sworn testimony, described the practices of State Street Bank's FX traders as a "totally unethical thing to do" and said that the FX Traders' practices were not within the "industry standard." *People of the State of Cal. ex rel Brown v. State Street*, No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento County Jan. 31, 2012) (Declaration of Kenny V. Nguyen).

89.     In the months that followed, State Street dramatically changed its FX trading policies and disclosures and so informed its custodial clients. Under these new policies, State Street admitted for the first time that it had systematically imposed additional charges for FX trading. For example, in an excerpt from an updated Investment Manager Guide dated November 20, 2009, State Street advised custodial clients that it would post on its website, my.statestreet.com, "current mark-ups and mark-downs used by State Street Global Markets for [standing-instruction] foreign exchange transaction requests."

90.     In a similar message sent to custodial clients such as ARTRS, State Street admitted that **"[s]ince December 2009**, State Street has provided to all of its custody clients and their investment managers via our dedicated client portal, my.statestreet.com, comprehensive disclosure of the pricing and execution methodology (including the maximum mark-up or mark-down that may be applied) for each of its Indirect [standing-instruction] FX Services." (Emphasis added.) State Street added that "on the day after a trade is executed, State Street provides for each currency pair the reference interbank rates and the times at which they are obtained, the actual rates, the daily high/low range at the time of pricing (where applicable) and the actual mark-up or markdown that was applied."

91.     State Street thus altered its practices to allow custodial clients more complete access to FX trading data only after its deceptive acts and practices began to be revealed. State Street's late disclosure that it charged mark-ups and mark-downs on standing-instruction FX trades contradicts its previous repeated assurances that FX rates would be based on market rates at the time the trade is executed.

92.     According to a study conducted by an independent FX analyst after the California *qui tam* complaint was unsealed and State Street altered its FX policies, the cost of standing instruction FX trades dropped by a remarkable **63%.** The study analyzed 498,940 FX spot and forward trades (196,280 standing-instruction trades and 302,660 negotiated trades) executed during 2000-2010, and found that investors who had their custodian banks, including State Street, execute FX trades on a standing-instruction basis during 2010 saw an overall 63% drop in trading costs from their average trading costs for the years 2000-2009.

**D.     FX Trading and State Street's Commingled ERISA Fund Clients**

    **1.     The Plaintiffs' Plans**

93.     The Andover Plan and the Boeing Plan are "employee pension benefit plans" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

94.     Defendants provide FX trading services similar to those provided to the Andover Plan and the Boeing Plan to other similarly situated Plans, either directly as a plan custodian, or trustee, or indirectly as investment manager for the commingled Funds in which the Plans invest.

95.     There are two types of ERISA-covered pension plans: defined benefit plans and defined contribution plans. Both types of plans have found it necessary and prudent to expand their investments to include exposure to foreign markets. Accordingly, defined benefit plans have expanded international holdings, and defined contribution plans frequently include at least one, if not several, international investment options.

96.     ERISA-covered plans regularly purchase and sell foreign securities in order to increase diversification and take advantage of opportunities for higher returns. Retirement plans that invest in foreign securities receive principal, dividends, and interest that are paid in foreign currencies, or participate in other investments that require the exchange of foreign currency into and from US Dollars ("USD"), either directly or through participation in the commingled Funds. As a result, the purchase and sale of currencies incidental to a foreign securities transaction is vital to a plan's participation in international securities markets and to the acquisition, holding, and disposition of foreign securities.

97.     State Street served as trustee and investment manager for the Andover Plan. Beginning in 2001, the Andover Plan offered participants the option to invest in certain International Equity Funds, including the International Growth Opportunities Securities Lending Class A Fund, and the SSgA Daily International Alpha Select Fund. These International Equity Funds held foreign securities and would have been, directly, or indirectly, party to FX transactions executed by SSGM pursuant to instructions from State Street Bank. Neither of these Funds could have been operated without FX transactions, whether or not these transactions were executed at the fund level or at the brokerage level. State Street Bank, as the investment manager and fiduciary for these commingled funds, was ultimately responsible for the funds' FX transactions undertaken by SSGM.

98.     State Street served as trustee and investment manager for the Boeing Plan. The Boeing Plan offered participants the option to invest in certain International Equity Funds, including the International Index Fund. This International Equity Fund sought to provide long-term total return, and attempted to match the Morgan Stanley Capital International All Country World Investable Market Index. This is an index composed of global developed and emerging countries outside the U.S. The fund seeks to achieve its goal by investing in a wide variety of international equity securities issued throughout the world, excluding the U.S. The foreign-held securities in this fund would have been, directly, or indirectly, party to FX transactions executed by SSGM pursuant to instructions from State Street. This commingled investment fund could not have been operated without FX transactions, whether or not these transactions were executed at the fund level or at the brokerage level. State Street Bank, as the investment manager and fiduciary for this commingled fund, was ultimately responsible for the fund's FX transactions.

## 2.     Defendants' Fiduciary Status

99.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S. C. § 1002(21)(A)(i).

100.    Under ERISA, an investment manager is a fiduciary. ERISA defines investment manager as:

> (38) any fiduciary (other than a trustee or named fiduciary, as defined in section 1102 (a)(2) of this title)—
>
> (A) who has the power to manage, acquire, or dispose of any asset of a plan;
>
> (B) who

(i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.];

(ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b–3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

(iii) is a bank, as defined in that Act; or

(iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

Section 3(38), 29 U.S.C. § 1002(38).

101.    Here, State Street served as the Investment Manager for the International Equity Funds in Plaintiffs' Plans and, upon information and belief, hundreds of other plans as well. In this capacity, State Street was responsible for prudently and loyally managing the assets that were invested in the International Equity Funds, and authorizing, reviewing and controlling the coduct of any State Street Affiliate or representative engaging in activities affecting the value or performance of the Funds for which State Street served as Investment Manager.

102.    State Street expressly acknowledges its status as Investment Manager in the Plan documents for the Andover Plan, including the Plan's December 31, 2006 and June 30, 2007 Fact Sheets.

103.    Upon information and belief, State Street has similarly acknowledged its fiduciary status as Investment Manager for the commingled Funds for all other ERISA-covered Plans that offer the International Equity Funds as an investment option for participants' retirement savings.

104.    Upon information and belied, all of the commingled Funds which invested in foreign securities suffered from the same inaccurate FX pricing described in the California qui

tam complaint, the California Attorney General complaint-in-intervention, and the ARTRS

complaint for standing-instruction FX trades.

105.    Under ERISA, investments in commingled Funds are subject to a "look-through"

rule, pursuant to which, the "plan assets" of an ERISA-covered plan include both its undivided

"equity interest [in the entity] and an undivided interest in each of the underlying assets of the

entity …". 29 C.F.R. § 2510.3-101(a)(2); *see also* ERISA § 3(42), 29 C.F.R. § 1002(42)

(authority of Secretary of Labor to define term "plan assets" by regulation). Specifically, when a

Plan acquires or holds an interest in a commingled Fund, "its assets include its investment and an

undivided interest in each of the underlying assets of the entity." *Id.* § 2510.3-101(h)(1).

106.    "[A]ny person who exercises authority or control respecting the management or

disposition of such underlying assets, and any person who provides investment advice with

respect to such assets for a fee (direct or indirect) is a fiduciary of the investing plan." *Id.*

§ 2510.3-101(a).

107.    As the sponsor and investment manager for the commingled Funds, State Street

Bank exercised authority and control with respect to the management or disposition of the Plans'

assets. Accordingly, State Street Bank was a fiduciary of each and every ERISA Plan which

invested in the commingled Funds, including the Plaintiffs' Plans and the Plans of the putative

class members with respect to the underlying assets of each and every State Street Bank-

sponsored commingled Fund.

108.    As trustee for certain of the commingled Funds, State Street Bank was authorized

to convert any monies into currency through foreign exchange transactions and was responsible

for ensuring that these transactions were within the bounds of State Street Bank's fiduciary

responsibilities and the limitations of ERISA.

109.    State Street Bank and SSGM also functioned as fiduciaries to the Plans and the

Class by acting as trustee and investment manager for the Andover Plan and the Boeing Plan,

and for the commingled Funds, and by exercising authority and control over the Plans' assets.

110.    Upon information and belief, SSGM provided brokerage services to the Funds, that is, the purchase and sale of foreign securities to the commingled investment funds. To the extent that the Funds settled such purchases and sales in U.S. Dollars, the commingled Funds did not engage directly in FX trading in connection with the purchase or sale of foreign securities, but they did engage in FX trading indirectly when SSGM executed a purchase or sale of a foreign security in foreign currency and then converted the transaction to a U.S. Dollar-denominated transaction for purposes of settlement with the commingled Funds.

111.    SSGM also served as a conduit for the repatriation of dividend, principal, and interest payments by issuers of foreign securities and for receipt of proceeds of sales of foreign securities, and engaged in FX transactions in order to remit such payments to the commingled Funds in U.S. Dollars.

112.    SSGM, in serving as a broker for the Plans' accounts also was bound to act in the customer's interest when transacting such business for the account, and therefore, had the duty not to misrepresent any fact material to the transaction, and to disclose adequate information to the fiduciaries of the Plans, and in the course of that transaction did not have a general fiduciary duty, but did have a limited transactional fiduciary duty to the Plans as a broker. In its role as State Street Bank's affiliate, SSGM was responsible for setting the exchange rates on FX transactions and executing those transactions. This process created the excessive spread between the marked-up FX exchange rates charged to custodial ERISA plan clients and the marked-down FX exchange rates used to process repatriation of principal, dividends, and interest paid in foreign currencies, and other FX transactions.

113.    SSGM's conversion of foreign currency to U.S. dollars constituted the exercise of authority or control respecting the management or disposition of the underlying assets of the commingled investment funds and, therefore, of assets of the ERISA Plans, within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(1), and 29 C.F.R. § 2510.3-101(a). Accordingly, State Street Bank and SSGM were functional fiduciaries of the ERISA Plans.

E.   **State Street's FX trades were prohibited transactions under ERISA and corresponding federal regulations.**

114.   ERISA § 406(a), 29 U.S.C. §1106(a), prohibits transactions between a plan and a party in interest; this broad prohibition is subject to numerous exemptions to allow the normal course of business with regard to investment management. Foreign currency exchanges between an employee benefit plan and a bank or a broker-dealer or an affiliate thereof which is a party in interest with respect to such plans are exempted from the prohibition provided they meet certain conditions. First, the terms of the transaction must not be less favorable to the plan than the terms generally available in comparable arm's-length foreign exchange transactions between parties; second, neither the bank, the broker-dealer, nor any affiliate thereof may have any discretionary authority or control with respect to the investment of the plan assets involved in the transaction. Prohibited Transaction Exemption 94-20, 59 Fed. Reg. 8022-02 (February 17, 1994). Prohibited Transaction Exemption ("PTE") 94-20 also required that any such transaction be directed by a fiduciary independent of the bank, broker-dealer, or any affiliate. PTE 98-54 modified this requirement to allow such transactions to occur pursuant to "standing instructions," authorized in writing by the independent fiduciary. Prohibited Transaction Exemption 98-54, 63 Fed. Reg. 63503-63510 (November 13, 1998). The requirements that the transactions be at arm's-length and that the bank, broker-dealer, or affiliate thereof not have any investment discretion with respect to the transaction are codified at 29 U.S.C. § 1108(b)(18) (effective August 17, 2006).

115.   State Street Bank and SSGM are "affiliates" within the meaning of the Prohibited Transaction Exemption and they directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with each other.

116.   Notwithstanding any standing instructions or written authorization by the Plans, State Street did not meet the requirements for the foreign exchange exemption, because the transactions were in fact consistently less favorable to the Plans than the terms generally available in comparable arm's-length foreign exchange transactions between parties, and because State Street exercised discretionary authority and control over the investments and plan assets

involved in the transactions. Thus, State Street's FX trades do not fall under PTE 94-20 or under PTE 98-54.

117.    Furthermore, ERISA § 406(b), 29 U.S.C. § 1106(b), prohibits transactions between a plan and a fiduciary that amount to self-dealing.[2]  Plaintiffs allege that State Street's FX trading practices amounted to self-dealing because State Street consistently negotiated rates, or charged rates for the FX transactions that were favorable to State Street, and unfavorable to its fiduciary clients, and State Street thus had a conflict of interest with regard to its FX trading practices for Plaintiffs and other class members.

## COUNT I

### Breach of Duties of Prudence and Loyalty

### (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by State Street Bank)

118.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

119.    Defendant State Street Bank is an "investment manager" within the meaning of ERISA section 3(38), 29 U.S.C. § 1002(38), because it (i) has the power to manage, acquire, or dispose of plan assets placed in its custody; (ii) is a bank within the meaning of the Investment Advisers Act of 1940; and (iii) has acknowledged in writing that it is a fiduciary with respect to the Plans.

120.    As an investment manager, State Street Bank is a fiduciary under ERISA and bound by the duties of prudence and loyalty laid out in ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1). These duties mean that as a broker for the Plaintiffs' Plans, State Street Bank is bound to act in the customer's interest when transacting business for the account, and thus

---

[2] 29 U.S.C. §1106 (b) Transactions between plan and fiduciary
A fiduciary with respect to a plan shall not—
(1) deal with the assets of the plan in his own interest or for his own account,
(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

bound, for example, to disclose fully to the Plans all the details of the relevant FX trading transactions it was undertaking for the account.

121.    State Street Bank has breached its ERISA fiduciary duties of prudence and loyalty because it knew or should have known that SSGM has been charging the Plans (or the commingled Funds in which the Plans invested) rates for FX trading that were unfavorable or unreasonable, above the market rates, and/or in excess of what SSGM had agreed to charge, but did not ensure, by negotiation or otherwise, that SSGM's rates were reasonable, at or above the market rate, and/or not in excess of what SSGM had agreed to charge.

122.    These breaches of fiduciary duty involved assets of the Plans on which fees were levied by State Street Bank or SSGM.

123.    Section 409(a) of ERISA, 29 U.S.C. § 1109(a), imposes liability on State Street Bank for these breaches and requires State Street Bank to make good to the Plans the losses resulting from its breaches.

124.    To enforce the relief available under section 409(a), 29 U.S.C. § 1109(a), Plaintiffs assert this claim against State Street Bank under ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2).

125.    Further, pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), State Street Bank must provide other appropriate equitable relief to redress its breaches of duty and enforce its fiduciary duties.

## COUNT II

### Breach of Duties of Prudence and Loyalty

### (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by SSGM)

126.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

127.    SSGM is a fiduciary under ERISA section 3(21)(A), 29 U.S.C. § 1002, with respect to the Plans because it exercises authority or control respecting management or disposition of the Plans' assets.

128.    As a fiduciary, SSGM is bound by the duties of prudence and loyalty laid out in ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1).

129.    SSGM has breached these duties or prudence and loyalty by charging the Plans (or the commingled Funds in which the Plans invested) fees for FX trading that were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge.

130.    These breaches of fiduciary duty involved assets of the Plans over which SSGM had authority or control.

131.    Section 409(a) of ERISA, 29 U.S.C. § 1109(a), imposes liability on SSGM for these breaches and requires SSGM to make good to the Plans the losses resulting from its breaches.

132.    To enforce the relief available under section 409(a), 29 U.S.C. § 1109(a), Plaintiffs assert this claim against SSGM under ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2).

133.    Further, pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), SSGM must provide other appropriate equitable relief to redress its breaches of duty and enforce its fiduciary duties.

## COUNT III

### Prohibited Transactions

### (Violations of § 406(a)(1)(C)-(D) of ERISA, 29 U.S.C. § 1106(a)(1)(C)-(D) by State Street Bank and SSGM)

134.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

135.    ERISA section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that the transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

136.    ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that the transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

137.    As noted above, State Street Bank is a fiduciary with respect to the Plans.

138.    SSGM is a "party in interest" within the meaning of ERISA section 3(14), 29 U.S.C. § 1002(14), for at least two independently sufficient reasons: it is a fiduciary with respect to the Plans, and it is a person providing services to the Plans.

139.    By allowing SSGM to charge the Plans (or the commingled Funds in which the Plans invested) fees for FX trading that were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge—and by doing so when it knew or should have known that SSGM was charging the Plans such fees—State Street Bank violated ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D). Further, by charging such fees, SSGM violated ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D).

140.    While ERISA section 408(b)(2), 29 U.S.C. § 1108(b)(2), provides an exemption from the prohibitions of ERISA section 406(a), 29 U.S.C. § 1106(a), for contracting or making reasonable arrangements with a party in interest for, *inter alia*, services necessary for the establishment or operation of the plan, that exemption is only met if no more than reasonable compensation is paid. Here, that exemption does not apply because the fees charged by SSGM were unfavorable or unreasonable and/or above market rates.

141.    While there is another exemption from the prohibitions of ERISA section 406(a), 29 U.S.C. § 1106(a), for foreign currency exchanges between an employee benefit plan and a bank or a broker-dealer or an affiliate thereof which is a party in interest with respect to a plan, that exemption does not apply here for two independently sufficient reasons: because (1) the terms of the transactions were less favorable to the Plans than the terms generally available in comparable arm's-length foreign exchange transactions; and (2) SSGM had discretionary authority or control with respect to the investment of plan assets.

142.     Pursuant to ERISA section 502(a)(2) and (a)(3), 29 U.S.C. § 1132(a)(2) & (a)(3), State Street Bank and SSGM are liable to restore the losses to the Plan and provide other appropriate equitable relief.

## COUNT IV

### (Co-Fiduciary Liability, against SSGM and State Street Bank)

143.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

144.     As alleged above, SSGM and State Street Bank are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty and prudence.

145.     ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (1) he or she knows of such a breach and fails to remedy it, (2) knowingly participates in a breach, or (3) enables a breach. The Co-Fiduciary Defendants breached all three of these provisions.

146.     State Street Bank and SSGM knew of the breaches of the other party because upon information and belief, the two entities work closely together, and State Street Bank knew that SSGM was not providing full disclosure in its role as a broker for the FX transactions.

147.     Neither State Street Bank nor SSGM undertook any efforts to halt or alter the fees being charged by SSGM by the commingled Funds, or more fully negotiate those fees.

148.     State Street Bank and SSGM knowingly participated in the breaches of the other party because they continued to engage in the transactions over a course of years, were fully aware that full disclosure had not been made to the Plan sponsors, fiduciaries or participants regarding the FX trading rates their Funds were being charged and the fact that those rates were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge.

149.     State Street Bank and SSGM enabled the other party's breach because they were fully aware that full disclosure had not been made to the Plan sponsors, fiduciaries or participants regarding the rates their funds were being charged for FX trading and the fact that those rates were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge.

150.     Pursuant to ERISA § 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT V

### (Violations of § 406(a)(1)(C)-(D) of ERISA, 29 U.S.C. § 1106(a)(1)(C)-(D) by SSGM, alleged in the alternative)

151.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

152.     As alleged above, SSGM was a party in interest under ERISA.

153.     As alleged above, SSGM violated ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D).

154.     Even if SSGM were not a fiduciary, SSGM would still be liable under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), to provide appropriate equitable relief due to its violations of ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D).

## COUNT VI

### (Knowing participation in a breach of fiduciary duty by SSGM, alleged in the alternative)

155.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

156.     Even if SSGM were not a fiduciary, SSGM knowingly participated in State Street Bank's breach of its fiduciary duties to the Plans, as alleged in Count I.

157.    As a sophisticated financial institution, SSGM fully understood the duties that fiduciaries such as State Street Bank have under ERISA.

158.    Despite this understanding, SSGM participated in—indeed, was the *cause* of— State Street Bank's violation of its fiduciary duties as alleged in Count I.

159.    Under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), the Plans are entitled to equitable restitution from SSGM with respect to the excess amounts paid to it by the Plans, as well as other appropriate equitable relief.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    Declare that the Defendants have violated ERISA's prohibited transactions provisions;

2.    Declare that the Defendants breached their fiduciary duties under ERISA;

3.    Issue an order compelling a proper accounting of the foreign exchange transactions in which the Plans and the Funds have engaged;

4.    Issue an order compelling Defendants to restore all losses caused to the Plans (or that will be caused to the Plans after the filing of this Complaint);

5.    Issue an order compelling the Defendants to disgorge all fees paid and incurred to Defendants (or that will be paid or incurred by the Plans after the filing of this Complaint), including any profits thereon;

6.    Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

7.    Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as custodians to the Plans;

8.    That this action be certified as a class action and that each Class be designated to receive the amounts restored to the Plans by Defendants and a constructive trust be established for distribution to the extent required by law;

9.     Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

10.     Award Plaintiffs their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

11.     Award such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs hereby demand a jury on all issues so triable.


Dated: September 12, 2012


**HUTCHINGS, BARSAMIAN,
MANDELCORN & ZEYTOONIAN, LLP**

By: s/ Theodore M. Hess-Mahan
Theodore M. Hess-Mahan, Esq. BBO #
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: 781-431-2231
Facsimile: 781-431-8726
*thess-mahan@hutchingsbarsamian.com*

**KELLER ROHRBACK, L.L.P.**
Lynn Lincoln Sarko (*pro hac vice pending*)
Derek W. Loeser (*pro hac vice pending*)
Laura R. Gerber (*pro hac vice pending*)
1201 3rd Avenue, Suite 3200
Seattle, WA 98101
Telephone: 206-623-1900
Facsimile: 206-623-8986
*lsarko@kellerrohrback.com*
*dloeser@kellerrohrback.com*
*lgerber@kellerrohrback.com*

***Counsel for Plaintiffs***